UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LISA R. TOMLIN,                )
                               )
          Plaintiff,           )
                               )
vs.                            )          No. 4:11CV1871 HEA
                               )
WASHINGTON UNIVERSITY,         )
                               )
          Defendant.           )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary

Judgment, [Doc. No. 23].  Plaintiff opposes the motion and has filed a written

memorandum in opposition.[1]  For the reasons set forth below, the Motion is

granted.

## Introduction

Plaintiff brought this action alleging retaliation by Defendant for Plaintiff

having exercised her rights under the Family and Medical Leave Act of 1993, 29

U.S.C. § 2611, *et sec*., and for complaining about race discrimination in violation

of the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq*.

---

[1] Also pending is Plaintiff's Motion to Appoint Counsel, [Doc. 44].  Subsequent to filing Plaintiff's opposition to the Motion for Summary Judgment and the Reply being filed, counsel for Plaintiff filed a motion to withdraw.  The motion was granted on April 17, 2013. Because the Court concludes summary judgment is appropriate, Plaintiff's motion for appointment of counsel is moot.

## Facts and Background

Plaintiff's Complaint alleges that she was hired by Defendant on December 18, 2006 in the School of Medicine, Department of Anesthesiology.  She was promoted and transferred on November 26, 2007 to a position in the School of Medicine, Department of Surgery.  Plaintiff remained in her position in the Department of Surgery until November 12, 2009, when her employment was terminated.  Plaintiff claims that during the time she was employed by Defendant, she performed her job satisfactorily.  Plaintiff understood that her employment was "at will" and could be terminated at any time.

In opposition to Defendant's Motion for Summary Judgment, Plaintiff has submitted a 107 page response and additional statement of material facts wherein Plaintiff denies all facts, with the exception of being hired and fired by Defendant.[2]  Although Plaintiff attempts to "deny" all of Defendant's other undisputed facts, Plaintiff's denials fail to effectively controvert those facts in accordance with Local Rule 7-4.01 (E).  Rule 7-4.01(e) p of this Court's Local Rules provides:

Rule 7-4.01(E)  A memorandum in support of a motion for summary

---

[2]  Although Plaintiff "admits" Paragraph 49 of Defendant's Statement of Uncontroverted Facts, following this "admission," Plaintiff proceeds to detail her reasons for disputing the facts contained in Paragraph 49, thus the Court assumes Plaintiff intended to deny the facts contained therein.

judgment shall have attached a statement of uncontroverted material
facts, set forth in a separately numbered paragraph for each fact,
indicating whether each fact is established by the record, and, if so,
the appropriate citations. Every memorandum in opposition shall
include a statement of material facts as to which the party contends a
genuine issue exists. Those matters in dispute shall be set forth with
specific references to portions of the record, where available, upon
which the opposing party relies. The opposing party also shall note
for all disputed facts the paragraph number from movant's listing of
facts. All matters set forth in the statement of the movant shall be
deemed admitted for purposes of summary judgment unless
specifically controverted by the opposing party.

Plaintiff attempts to controvert Defendant's uncontroverted facts with the

statement that Defendant has misstated and/or omitted material facts.  Further, she

presents conclusory denials while at the same time rephrases the exact facts which

Defendant has presented.  Plaintiff additionally adds argumentative material to her

statement and adds further statements that contradict her previous testimony.  She

completely neglects to specify which specific facts she denies and fails to support

her denials with specific references in the record.  As Defendant thoroughly

details, Plaintiff's responses result in having Defendant's facts deemed admitted

based on Plaintiff's shortcomings.  See *Brown v. City of Jacksonville*, 711 F.3d

883, 888, n. 5 (8th Cir. 2013)( "See  *Rodgers v. City of Des Moines*, 435 F.3d 904,

908 (8th Cir.2006) ('[W]e will not mine a summary judgment record searching for

nuggets of factual disputes to gild a party's arguments.'); *United States v. Dunkel*,

927 F.2d 955, 956 (7th Cir.1991) (per curiam) ('Judges are not like pigs, hunting

for truffles buried in briefs.'); cf. *Gilbert v. Des Moines Area Com. Coll*., 495

F.3d 906, 915 (8th Cir.2007) ('A district court is not required to speculate on

which portion of the record the nonmoving party relies, nor is it obligated to wade

through and search the entire record for some specific facts that might support the

nonmoving party's claim.' (internal quotation omitted)).")

　　Prior to being hired as a Grants/Budget Specialist, Plaintiff met with Dr.

William Hawkins, a faculty member.  During the meeting, Dr. Hawkins told

Plaintiff that he wanted someone in the position that he could trust, who was

responsive, and who would not send anything out without his approval.

　　The required qualifications of a Grants/Budget Specialist are listed as

"Equivalent of Bachelor's degree in accounting with related experience in grants

administration, spreadsheets and scientific terminology. (Exh. L8). The preferred

qualifications of a Grants/Budget Specialist are listed as "working ability to

develop financial reports and analyze numerical/statistical data with flexibility to

meet multiple priorities/deadlines as necessary.  Familiarity with Washington

University systems including PDS, AIS, AND HRMS.

　　On December 18, 2006, Plaintiff was hired by Defendant as a Grants

Assistant III in the School of Medicine's Department of Anesthesiology.   As a

Grants Assistant III, plaintiff's duties were to assemble researchers' grant applications and to perform "secretarial duties" such as making copies, ordering supplies, coordinating conferences and meetings, making coffee and ordering lunches.

Plaintiff "wanted more of a challenge" with respect to doing more with grants and thus sought other employment within the University.  On November 26, 2007, plaintiff was promoted and transferred to the position of Grants/Budget Specialist in the Department of Surgery's Business Office ("Business Office"), which included an  increase of $10,000 in salary.  Plaintiff was hired into this new position by Nancy Bertelsman, Director of Business Operations for the Business Office.  At the start of her employment in the Business Office, Plaintiff understood that her employment was at will and "may be terminated at any time."

Prior to being hired as a Grants/Budget Specialist, plaintiff was interviewed by Dr. William Hawkins, a faculty member, who during the interview informed Plaintiff that he wanted someone in the position that he could trust, would be responsive, and would not send out materials without his approval.

The job duties of a Grants/Budget Specialist focused on managing all business aspects of research funding for faculty members from beginning to end, which included assisting in the preparation and submission of grant applications

and budgets, management and approval of expenses (including sourcing of payroll), preparation of financial reports, and closing out funds at their expiration. The position requires the ability to multi-task, independently handle competing priorities, and work in a proactive manner.  The faculty members are viewed as customers of the Business Office and thus Specialists must be customer-service oriented and have a "can do" attitude when met with requests from faculty members.

The proper submission of grant proposals and obtaining grant funded work is "extremely important" to and is the "life blood" of faculty member researchers. Obtaining grant funds likewise is important to faculty member researchers' careers and promotions and to the research mission of the department.  Grant funding is "important" to employees working for faculty members on grant funded projects because successful applications result in work, while failure to obtain the grant results in people not having work to do.

The budgeting, accounting and financial aspects of the Grants/Budget Specialist position are very important to faculty members because they need to ensure that the appropriate effort and resources are spent towards a project as detailed in the grant. The closing out of expired funds is important because, if there are balances not accounted for, the University may have to return funds to

the sponsoring agency and older funds that have been closed out can reflect poorly on the University from the perspective of sponsoring agencies.

Plaintiff estimated that it took her about 3 months to be trained as Grants/Budget Specialist to feel comfortable with job duties and feel proficient in performing them.

On January 7, 2008, Plaintiff met with Joan Williams in the University's Human Resources Department to discuss what plaintiff perceived to be insulting and harassing behavior towards her by two other Grants/Budget Specialists, Cindy Martinez and Connie Pliemling.  In this meeting, Plaintiff related that Pliemling had made a comment to Plaintiff, "I thought you were a ghost," early one morning when Plaintiff was retrieving a document from a shared printer and inadvertently startled Pliemling.  Plaintiff questioned whether it was a "racially charged" remark, did not "want to be overly sensitive" and "make something – if there was nothing," and thus did not want to proceed with a complaint.  At that meeting, Plaintiff informed Williams that Bertelsman was "working on issues."  In fact, when Bertelsman discovered the problems plaintiff was having with Martinez and Pliemling, Bertelsman, according to plaintiff, put an end to their behavior by meeting with Martinez and Pliemling and then met with Plaintiff to encourage her to report any behavior "next time this happens."  According to Plaintiff,

Bertelsman resolved the problems with Martinez and Pliemling to Plaintiff's

satisfaction, and Plaintiff's relationship with Martinez and Pliemling was better

after this resolution. In 2008, the workload for all Grants/Budget Specialists

began to increase due to "an enormous amount of submissions."  The workload

for all Grants/Budget Specialists continued to increase in early 2009 because of

federal stimulus funds available for research such that all Grants/Budget

Specialists were swamped by March 2009. Plaintiff "began to feel overwhelmed

by the workload" because of the increase in grants submissions and grants under

management. On September 23, 2008, Emily Hixson, Plaintiff's direct supervisor,

gave Plaintiff her performance evaluation for the period of January 1 through

September 19, 2008.  In the self-assessment portion of the evaluation, Plaintiff

noted the importance of meeting or exceeding the expectation of faculty members

on grant submissions, quickly responding to faculty members' needs and

questions, and applying all expenditures before the end of the projects or by year

end.  Plaintiff further set a goal "[t]o more quickly adjust my time in response to

workload and priority changes" and noted that she considered her workload was

too much, with old account problems and clean-up contributing.  Similarly,

Hixson noted areas for improvement on Plaintiff's need to delegate tasks, improve

account maintenance, and working as a team member, and Hixson further

highlighted the need to clean up accounts and improve Plaintiff's response time and responsiveness to Hixson's e-mails and requests.

The data on grants submitted and funds under management for Grants/Budget Specialists for fiscal years 2007, 2008 and 2009 show that Specialists other than Plaintiff had more grant submissions and funds. Cindy Martinez had the heaviest workload of all Specialists in this time frame.

In January or February 2009, Plaintiff made a request to Hixson that Plaintiff no longer work on the grants of Dr. Ming You, a faculty member. The request could not be accommodated at that time because Dr. You was one of the two busiest faculty researchers and such a redistribution of workload would have meant a complete shift of assignments and because, with new Grants/Budget Specialists expected to be hired, there would be redistribution of workload when that occurred. However, Bertelsman and Hixson moved forward with the hiring of a new Grants/Budget Specialist to work on Dr. You's grants in part to accommodate Plaintiff's request.

In March and April 2009, issues arose relating to the closing out and resolution of several of Dr. You's expired funds and accounts. On April 21, 2009, Plaintiff prepared documents listing 18 of Dr. You's funds and accounts (some from 2006, 2007, and 2008) that had "unresolved account issues" and identifying

"steps needed to be taken to close out the accounts" for a meeting with Dr. You "to get some resolution to closing these accounts." Plaintiff acknowledged at that time the "need to move spending along" and the "need to do –close accounts." Several of these funds and accounts remained unresolved and not closed out nearly seven months later at the time of the termination of Plaintiff's employment on November 12, 2009.

In late April 2009, after the workload increased and issues with Dr. You's funds and accounts arose, Plaintiff began seeking other employment opportunities within the University. In April or May 2009, Plaintiff reported to Bertelsman that "due to the workload" she was "experiencing an overwhelming degree of stress" and her "stomach was literally in knots."

In May 2009, Plaintiff discussed "her desire to seek other employment opportunities" within the University and requested a letter of recommendation. Bertelsman was supportive of plaintiff's efforts. Between June and August 2009, Plaintiff applied for eight other jobs within the University.

Also in May 2009, it was announced that two Grants/Budget Specialists would be hired to address the workloads of the existing Specialists, and on May 13, 2009, one such position was posted with the same title, duties and salary range as Plaintiff's Specialist position. In a May 11, 2009 staff meeting, Hixson

announced that applicants for the Specialist position were being considered.   In

July 2009, it was announced that Vicki Ferrari had accepted the Specialist

position, and she started on August 3, 2009.  No other similar or related job

position was posted in this time frame.

On May 11, 2009, in a staff meeting, Hixson stated her expectations that

funds should be closed within 90 days of their end date and that all funds with an

end date of March 31, 2009, and earlier were to be closed out by June 30, 2009.

Two employees in the Business Office were available to assist Grants/Budget

Specialists in meeting these expectations, and Linda Devillez was to assist

Plaintiff.

On  May 20, 2009, Hixson gave Plaintiff her performance evaluation for

the period of September 20, 2008 through May 20, 2009, and Hixson discussed

her expectations with Plaintiff that were set out in the evaluation.  Hixson listed

three areas of improvement for Plaintiff: (1) "Improving the ability to switch

between competing priorities"; (2) "Resolving old accounts and awards (Linda is

assisting)"; and (3) "Attitude has suffered since GELCC [Dr. You grant] & Dr.

You's old funds have come into focus.  Need to improve."  Hixson further set

forth her expectations that Plaintiff "meet all deadlines," "close out all funds

within 90 days," "clean up the fund," and "seek help when you need it."   One

goal set by Plaintiff in the evaluation was to have "accounts all cleaned up."

In  April 2009, after discussions between Dr. You, Bertelsman and Hixson, it was decided that a new position would be created that would be exclusively dedicated to Dr. You because of his need to have one person to perform grant-related and administrative duties and because of Plaintiff's prior request to no longer work with Dr. You.  This position was a Grants/Budget Specialist, but also would include administrative duties such as ordering supplies, coordinating travel, handling scheduling, and"whatever else would be entailed in the lab."   There was no job posting for this position because it was a Grants/Budget Specialist position with the same salary range and primary duties.  Plaintiff and Ferrari sought this position with Dr. You, although Plaintiff believed it was a lab manager position despite Hixson informing her it was not a lab manager position and not a promotion.  After interviewing both candidates, Dr. You chose Ferrari for the position.  This decision was announced on September 1, 2009.

On August 25, 2009, Dr. Hawkins sent an e-mail to Plaintiff, Jamie Sauerburger (Executive Director of the Surgery Department), Hixson, Dr. Tim Eberlein (Chair of the Surgery Department) and others titled "My grant accounting is a total mess and has been for months."   At that time, Plaintiff knew Dr. Hawkins "was extremely upset."   In the email, Dr. Hawkins stated: "The

current situation in grant administration is not working.  My grant accounts are
not interpretable and have not been for a long time. We had a situation in the
spring of 2008 when I was required to return funds because we were not
organized enough to know they were available.  Since that time I have had
monthly meetings with Lisa and we try to correct who should be sourced to each
grant and for what percentage.  As new grants come and old grants finish up these
changes never get made or corrected. . . . It seems like a constant scramble on the
accounting end for each grant. . . . I need this fixed very soon. . . . The difference
[from a prior Specialist] is a continual slide in the wrong direction."  On that same
day, Bertelsman responded to Dr. Hawkins and addressed several of his concerns,
including "outstanding sourcing issues that [he] addressed with Lisa this
morning," about which Bertelsman "met with [Plaintiff] and reviewed those
changes."   On August 26, 2009, Dr. Hawkins stated in an e-mail how he wanted
people sourced and what he wanted Plaintiff "to accomplish before our meeting in
two weeks."

Also, on August 25, 2009, Plaintiff sent an e-mail to Hixson with "the list
of items that I am working on this week," in which plaintiff stated "my workload
is still overwhelming –so there are items that may not be addressed regardless of
the number of extra hours of effort that I expend."  ("I was overloaded and not

able to complete all tasks due to the workload.")  Included in this list were

account maintenance and payroll sourcing (including payroll cost transfers) for

Dr. You, Dr. Eberlein's training grant and Dr. Hawkins.  Plaintiff did not

complete the sourcing for Dr. You, Dr. Eberlein and Dr. Hawkins in a timely

manner in the view of her supervisors.  With respect to Dr. Eberlein, the grant was

awarded on August 1, 2009, and, in the judgment of Bertelsman and Hixson, the

forms necessary for trainees to receive stipends should have been sent out

immediately.   The sourcing on the training grant was not completed by the

August 31, 2009 deadline, and Plaintiff did not request help on the sourcing until

the August deadline had passed and only after being prompted by her supervisors.

In the August-September 2009 time frame, Plaintiff still had not closed out

the expired funds and accounts of Dr. You (including some from 2006, 2007 and

2008), which Plaintiff was directed to do in April and May 2009.  In Hixson's

judgment, Plaintiff continued to fail to seek help when it was required or to

clearly communicate her need for help.  Throughout her employment, Hixson

nonetheless took the initiative to help Plaintiff in completing tasks and offered to

help Plaintiff both before and after Plaintiff was issued a written warning.  In

between her May 2009 evaluation and the September 9, 2009 written warning,

Plaintiff did not always "appropriately respond to requests and questions" or

respond in a timely manner in the judgment of Plaintiff's supervisors, which they perceived to be a problem with Plaintiff's performance.

After announcing that Ferrari was chosen for the position with Dr. You on September 1, 2009, Bertelsman and Hixson decided that, due to the volume and complexity of Dr. You's grants and funds, a transition was required to move the funds from Plaintiff to Ferrari in order to reduce the workload of the Grants/Budget Specialists and to meet Dr. You's needs.  The transition was to run from September 2, 2009 to November 1, 2009, if not sooner.  Martinez was to train Ferrari on general job duties, while Plaintiff was to provide information specific to Dr. You's grants and funds and also was to close out the expired funds as previously directed.

On September 2, 2009, Plaintiff met with Joan Williams of Human Resources to discuss "events that occurred which involved hiring, assistance, communication" and to seek advice regarding contemplated "actions that could be construed as insubordination."  Later on September 2, 2009, Plaintiff, Hixson, Martinez and Ferrari met to discuss training and the transition to Dr. You.  During this meeting, Hixson observed that Plaintiff refused to answer specific questions (e.g., asking for names of researchers or structure of grants and funds), instead said the information was in the file, was on the list or that Hixson knew the

information, met several questions with silence, a shrug and a stare, and failed to give a helpful answer to any question.  As Plaintiff's supervisor, Hixson found this behavior to be unhelpful, unacceptable and insubordinate.  Both Martinez and Ferrari spoke with Hixson in private about how the meeting with Plaintiff was uncomfortable. Plaintiff acknowledged: "My answers and interpreted behavior were deemed unacceptable."

On  September 4, 2009, Bertelsman met with Plaintiff and found that Plaintiff's behavior (including silence in response to direct questions) was unacceptable and insubordinate.

Hixson, as Plaintiff's supervisor, believed that Plaintiff had problems managing multiple tasks, which is a crucial job requirement necessary to meet deadlines, and that Plaintiff failed to effectively communicate requests for help. No other Grants/Budget Specialist – even those white Specialists with heavier workloads than Plaintiff –had the performance deficiencies that Plaintiff did. As a result of her recurrent performance deficiencies and unacceptable behavior, Bertelsman and Hixson made the decision to issue a written warning to Plaintiff and believed the warning was necessary to improve Plaintiff's performance.

On September 9, 2009, Plaintiff was issued a written warning by Hixson, which detailed several expectations from the May 2009 evaluation that were "not

being met," including meeting defined deadlines (completing sourcing for Dr. You, Dr. Eberlein and Dr. Hawkins), closing out funds within 90 days, and seeking assistance. The warning further related that Plaintiff's behavior in the September 2, 2009 meeting was "unacceptable."  In the warning, Plaintiff was given certain expectations and changes that were "to be made immediately," including maintaining professional conduct and supporting Dr. You's transition, responding to requests for information in a timely manner, and addressing the sourcing issues on Dr. You's, Dr. Eberlein's and Dr. Hawkins' grants by September 24, 2009.  The warning further provided that daily meetings with Hixson would occur "to review daily priorities and progress to help you meet these expectations," and weekly meetings were to be held with Bertelsman to update her on same.   The warning further stated that "[i]mmediate and sustained improvement in these areas is required" and cautioned that, if expectations were not met, "future disciplinary action may occur, up to and including termination of your employment."

On September 9, 2009, after the issuance of the written warning, Plaintiff asked Hixson what the next disciplinary step would be, and Hixson replied by e-mail that she believed a final warning would be the next step and directed Plaintiff to the Employee Handbook for additional information.  In September through

November 2009, plaintiff had access to, understood, and reviewed (on September 13, 2009) the Employee Handbook.  Pursuant to the Employee Handbook, progressive discipline is not mandatory, and an employee of the University may be terminated at any time.  At the time of her reply e-mail on September 9, Hixson believed that there would be an intermediary step before Plaintiff's termination, but subsequently Plaintiff's continued performance deficiencies and the demands from two faculty members that Plaintiff no longer be assigned to work on their grants  made termination the appropriate next step under University policy.

As of September 9, 2009, Plaintiff believed the decision to terminate her employment already had been made.  Plaintiff further believed as of September 9, 2009 that no further progressive discipline would occur because the decision had been made been to terminate her employment.

In the Complaint filed in this lawsuit or in any submission to the EEOC, Plaintiff did not allege that she complained of race discrimination to the University before the issuance of her written warning on September 9, 2009. Bertelsman and Hixson were not aware of Plaintiff making any allegation or complaint of race discrimination before the issuance of the written warning on September 9, 2009.  Plaintiff did not come to work on September 10, 2009 or for the remainder of the month.

On September 14, 2009, Plaintiff sent an e-mail to Sauerburger and Williams demanding that her written warning be reversed, complaining about unfair discipline and workload, and stating that she intended "to file formal charges with the EEOC."

On September 15, 2009, Plaintiff sent another e-mail to Sauerburger and Williams alleging she had been discriminated against "based upon race" by "[d]isproportionate amount of work," "[u]nfair discipline and treatment in the workplace due to race," and "[p]romotion denial due to race."   The e-mail again stated that "I intend to file a formal complaint with the EEOC."  The e-mail further stated that the written warning could "impede" her ability to seek other employment opportunities within the University.

In September 2009, Plaintiff was seeking and interviewing for another job with the University's School of Social Work.

From September 15 through 30, 2009, while Plaintiff was on Family and Medical Leave Act ("FMLA") leave, Sauerburger and Williams continued to communicate with Plaintiff in an effort to meet with her about her complaint of discrimination.  Plaintiff appreciated their efforts to accommodate her while she was on leave.

Upon her return from leave on October 1, 2009, Plaintiff met with

Sauerburger and Sandra Sledge with Human Resources about her discrimination complaint and spent time during work hours searching through e-mails that purported to show Hixson was not helpful to Plaintiff.  On that same day, Plaintiff stated that, "since my request for reversal of disciplinary action was denied, I will be filing a formal complain [sic] with the EEOC first thing in the morning," and, on October 2, 2009, Sauerburger replied that Plaintiff had "the right to pursue whatever measures that are available" and reinforced that the University was "committed to gathering more information."

If the written warning had been reversed, Plaintiff "most likely would have not" filed an EEOC complaint because reversal of the warning "was the remedy [she] was seeking," and she "would have moved on."

No supervisor of Plaintiff made any disparaging comments about Plaintiff's race.

Prior to going on FMLA leave, Plaintiff was informed by her supervisors that she was not meeting expectations and received the September 9 written warning. After receiving the written warning, Plaintiff did not return to work and on September 14, 2009, requested an application form for FMLA leave from the University.  On September 22, 2009, Plaintiff submitted an application for FMLA leave to the University dated September 20, 2009.  Plaintiff sought leave from

September 10 to 30, 2009 and one to two days per month of intermittent leave until the end of the year because she was "incapacitated" by "stress" and "depression." ) The "stress" and "depression" were caused by Plaintiff's "overwhelm[ing]" workload.  On the date she submitted her leave application, the University immediately approved the requested leave.  Plaintiff does not criticize the University "for the way they handled" the application or initial leave request. While on leave, Plaintiff had at least two interviews for a job within the University's School of Social Work.  In October 2009, Plaintiff took five days of leave (more than the one to two requested and approved) due to side effects from a medication to treat osteopenia, which the University granted, and Plaintiff did not "have any problem with the way the University handled [her] leave requests in this sense."  Plaintiff was never denied intermittent leave.

On September 9 and 10, 2009, it was discovered that Plaintiff failed to budget for the University's overhead (which is taken as a percentage of grant awards by the University towards overhead for use of its facilities and other items) in the amount of $17,000 in a grant application by Dr. Corey Deeken, another faculty member.  Due to this omission, while plaintiff was on leave Dr. Deeken had to prepare and send a letter to the Dean of the Medical School requesting that he waive the overhead.  As a result of this incident, Dr. Deeken

requested that Plaintiff no longer work on her grants when Plaintiff returned from leave, and Hixson worked on her grants.

While plaintiff was on leave, Hixson and Ferrari met with Dr. You on September 10, 2009, about the sourcing issues that Plaintiff failed to complete, and the sourcing issues were resolved by the end of September.  While on leave, additional problems relating to sourcing and closing out funds were discovered with respect to Plaintiff's management of Dr. You's and other faculty members' grants on which Plaintiff worked.

Upon returning from leave on October 1, 2009, Plaintiff was assigned a new group of faculty members (Vascular Surgery) to replace the grants and funds that Plaintiff was no longer managing.  The workload for Vascular Surgery was less than the workload for Dr. You's grants and funds.  Plaintiff estimated that, before going on FMLA leave, Dr. You's grants accounted for 35-40% of her time, and that, after returning from leave, Dr. You's grants accounted for 15% of her time.  After returning from leave, Plaintiff's responsibilities with respect to Dr. You and the transition of his grants to Ferrari consisted of attending a single meeting on October 7, 2009 (in which Plaintiff admittedly said nothing) and closing out four of the expired funds that still remained unresolved despite being repeatedly instructed over the prior four months to close out those funds.  Plaintiff

- 22 -

had no new grants or accounts for Dr. You after returning from leave.  Only

closing out the expired funds of Dr. You, as she had been instructed to do since

April, was listed as a priority for Plaintiff after the meeting on October 7, 2009.

From October 1, 2009 through the end of her employment, Plaintiff met

with Hixson on an almost daily basis and with Bertelsman on a weekly basis to

discuss Plaintiff's work and set priorities.  Bertelsman and Hixson expended more

time and effort attempting to help Plaintiff in meeting her job expectations and

succeeding in her employment than they did for any other employee under their

supervision.

On October 1, 2009, Hixson directed Plaintiff to close out Dr. You's

expired funds  by the end of the month.  On October 21, 2009, closing out Dr.

You's expired funds was again listed as a priority by Bertelsman, and Plaintiff

was directed to bring a plan of action on closing them out to their next meeting.

On October 22, 2009, Hixson again directed Plaintiff to close out funds that

expired in 2007 and 2008 by the end of the month, and attached an internal

spreadsheet showing inquiries regarding those funds.  On October 27, 2009,

Hixson again directed Plaintiff to close out Dr. You's expired funds by the end of

the month and requested a status on her progress.

On November 2, 2009, Hixson noted that the October deadline set for the

- 23 -

closing out the funds "was not met" and gave Plaintiff specific priorities on what she was to do to close out the funds.  As of November 9, 2009, Plaintiff was still working on closing out Dr. You's funds and asked for additional time to review and gather information.  These funds were never closed out before Plaintiff's termination.  Ferrari was able to timely close out funds that Plaintiff did not complete.

On October 6, 2009, the issues with Dr. Eberlein's training grant remained unresolved, and Hixson gave a timeline to Plaintiff to resolve the issues with the trainee forms.   The timeline was not met, and these issues remained unresolved through October and into November.

Plaintiff did not respond to Dr. Hawkins' e-mails to her on October 12, 2009 about collaborative agreements for his R01 (NIH) grant due on November 5, 2009. Hixson instead had to respond, and Hixson sent Dr. Hawkins the requested collaborative agreements herself.

On  October 21, 2009, Ferrari informed Hixson that no one had been sourced for administrative work on one of Dr. You's contracts since 2006.  In Hixson's view, Plaintiff should have discovered this problem and resolved it immediately, as Ferrari did.

On October 15, 2009, Plaintiff told Dr. Hawkins that they would have six

items of information for his R21 (NIH) grant ready when the NIH made their "Just In Time" (JIT) information request.  The JIT request was received on October 22, 2009, but Plaintiff did not follow up with Dr. Hawkins relating to the JIT information until November 2 and 6, 2009.

Dr. Hawkins' R01 grant application requested $5 million in funding and was a resubmission of the grant, which Plaintiff previously had handled.  Through October and into November 2009, work on Dr. Hawkins R01 and R21 grants was set as a priority for Plaintiff, including as follows:

a. On October 8 and before, the R01 grant submission due on November 5, 2009 was a priority because it was "very big and important" and "time-sensitive."

 b. On October 14, Bertelsman directed Plaintiff to contact Dr. Hawkins about the JIT information on his R21 grant and to review collaborative agreements on the R01 grant.

c. On October 16, Plaintiff was directed to follow up with sub-contractors on the R01 grant by October 21, and this remained a priority on October 21.

d. On October 26, Hixson relayed a phone conversation she had with Dr. Hawkins about the R01 grant submission to Plaintiff because Dr.

Hawkins could not reach Plaintiff, and Hixson directed Plaintiff to contact Dr. Hawkins about outstanding items on the grant submission.

e. On October 28, Hixson directed Plaintiff to contact Dr. Hawkins on what she needed on the R21 JIT request, to follow up with the sub-contractors on the R01 grant, and to provide a status update to Dr. Hawkins on the R01.

f. On October 29, Hixson directed Plaintiff to keep up communications with Dr. Hawkins and to give him a full status update. Hixson noted that Plaintiff had failed to meet the expectations and priorities of following up with the R01 sub-contractors as directed and contacting Dr. Hawkins with an update as instructed.

g. On November 2, 4, and 5 the R01 grant submission and R21 JIT submission were listed as daily and weekly priorities.

h. On November 5, "[t]here was discussion about the reasons for delay" in submitting the R01.

I. On November 9, the R21 JIT was listed as a priority from the prior week that had not been met, and Hixson warned Plaintiff about the amount of work not performed and the priorities and deadlines not

met by Plaintiff.

On October 28, 2009, Dr. Hawkins e-mailed Plaintiff the final draft of the R01 grant (including his mentors' biosketches or CVs), asked that Plaintiff consult with him about any outstanding items, and directed her to get all required institutional approvals.  From his perspective, Dr. Hawkins' role in the grant submission was complete until his final review, and it was Plaintiff's job to ensure the remaining details were tracked down.  On October 29, 2009, Plaintiff e-mailed Dr. Hawkins with several outstanding items, and Dr. Hawkins replied to her within the hour with the information or with directions on how to proceed.  To Dr. Hawkins, several of the issues raised by Plaintiff in her e-mail exemplified her shortcomings as a Grants/Budget Specialist, in particular a request for him to cut and paste the grant into certain sections.  Dr. Hawkins felt Plaintiff was not an effective Grants/Budget Specialist because she did not anticipate or act independently, and he "didn't think personally that [Plaintiff] grew with the job to the point where she became very useful."  Dr. Hawkins believed everything in his October 29, 2009 e-mail should be completed within 24 hours, and, at that point, Dr. Hawkins believed the grant was on track to be submitted well in advance of the deadline and thanked Plaintiff for her efforts.  On November 2, 2009, Dr. Hawkins himself sent an e-mail to certain collaborators on the R01 grant for their

biosketches, despite this being a priority for Plaintiff; Dr. Hawkins believed this was something that should have been handled by Plaintiff with the grants offices of the collaborating Universities.  On November 3, 2009, Plaintiff asked Dr. Hawkins to approve changes in a budget that he outlined in an October 7 e-mail.

Despite their efforts to assist Plaintiff in meeting her job expectations, by the end of October 2009, Bertelsman and Hixson did not see any improvement in Plaintiff's performance; in fact, Plaintiff's performance continued to decline. Plaintiff would take three days to complete a budget that other Grants/Budget Specialists would complete in three hours.  Plaintiff continued to miss deadlines and continued to fail to respond to requests for information in a timely manner. Plaintiff refused to accept responsibility and would assign blame on someone or something else for her poor work performance and failures to meet expectations, always insisted that she was correct, and refused to accept the judgment and decisions of her supervisors.

On November 3, 2009, Bertelsman and Hixson met with Williams in Human Resources to discuss Plaintiff's failures to meet expectations, and it was recommended that Hixson continue to emphasize trends and action items in her daily meeting summaries and to spend a day with Plaintiff observing her.

On November 8, 2009, Dr. Hawkins sent an e-mail to Hixson insisting that

Plaintiff no longer be assigned as his Grants/Budget Specialist and stating he had

not been happy with her for a long time.  Dr. Hawkins specifically expressed his

disappointment with Plaintiff's handling of the R01 and R21 grants.  With respect

to the R01 grant, Dr. Hawkins wanted time to do a final review of the grant once

it was in the NIH grant system to make sure there were no errors and that the

correct versions of the grant's components were used.  The NIH had a two-day

window before the deadline in which a submitted grant can be reviewed in the

system, pulled back and revised.  Because of the delays in getting institutional

approvals, budgets and sub-contractor information, the resubmission did not occur

until November 5, 2009.  Dr. Hawkins was "disturb[ed]" that the delay in getting

several documents jeopardized submitting the grant on time.  When Dr. Hawkins

reviewed the grant in the system on November 5, 2009, he noticed several errors,

including the omission of biosketches (CVs) of his mentors.  Plaintiff had these

biosketches, but did not submit them.  Dr. Hawkins previously made it clear he

wanted these biosketches included because a review of a prior submission had

asked for letters of support from mentors and he believed the biosketches would

have been useful to the reviewers, and these biosketches could have been

submitted through various means in the system.  Dr. Hawkins was told that the

resubmission could not be changed because there was no guarantee that the

- 29 -

corrected grant could be resubmitted before the deadline passed.

With respect to the R21 grant, Dr. Hawkins expected the JIT information to be submitted within two weeks of the official request.  Plaintiff agreed that JIT information must be submitted "as quickly as you can."  The JIT request was made on October 22, 2009, and Plaintiff received notification of it from Dr. Hawkins. Plaintiff did not update and seek information from Dr. Hawkins until November 2, 2009, followed by another e-mail on November 6, 2009.  Plaintiff failed to meet her deadline of submitting the JIT information on November 6, 2009, and Dr. Hawkins expressed his concern about the JIT information not being timely.

On November 10, 2009, Hixson spent the day with Plaintiff and believed Plaintiff was not working at an acceptable or required level of performance.

Bertelsman and Hixson made the decision to terminate Plaintiff's employment, with Bertelsman having the final say over the decision.  Dr. Hawkins had no role in the decision.  Bertelsman and Hixson believed that Plaintiff's failure to improve her performance and behavior and failure to address the deficiencies set forth in her September 9, 2009 warning, as well as the demands by Dr. Deeken and Dr. Hawkins that Plaintiff no longer work on their grants, warranted termination of her employment.  Bertelsman and Hixson

believed that it was not appropriate to reassign her to another faculty member and continue her employment.

On November 12, 2009, Plaintiff's employment was terminated, and she was given a notice of termination giving the University's reasons for her termination.

Dr. Hawkins' criticisms of Plaintiff were not motivated by bias against her, and he was not "out to get" her. Hawkins had no knowledge of Plaintiff's claim of race discrimination until after this lawsuit was filed.

Bertelsman and Hixson made no comment about Plaintiff's complaint of race discrimination or her FMLA leave when her employment was terminated. Bertelsman herself took FMLA leave twice in 2008. Other employees in the Business Office under Bertelsman's supervision took FMLA leave in 2008 and 2009 and were not disciplined for doing so. One employee reporting directly to Hixson took FMLA leave in 2009 and was not disciplined for doing so.

## Discussion

## Summary Judgment Standard

The standard for summary judgment is well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005).  The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enter. Bank*, 92 F.3d at 747.  Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.  Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Krenik v. Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986)." *Hitt v. Harsco Corp.* 356 F.3d 920, 923 (8th Cir. 2004).  An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248; *Woods v. DaimlerChrysler Corp.,* 409 F.3d at 990.  To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.' *Wilson*

*v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)."
*Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003).  "[A]
complete failure of proof concerning an essential element of the nonmoving
party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at
323.  The Court will review the facts in this case with the stated standard in mind.

Section 1981 of Title 42 of the United States Code prohibits employers
from retaliating against employees for opposing racial discrimination. See 42
U.S.C. § 2000e–3(a); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454– 55
(2008); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059 (8th Cir.1997). " To prevail
on her retaliation claim under Section 1981, [Plaintiff]  must prove (1) she
engaged in protected activity; (2) she suffered a materially adverse employment
action; and (3) the materially adverse action was causally connected to her
protected activity. See *Kim*, 123 F.3d at 1060; see also *Burlington N. & Santa Fe
Ry. Co. v. White*, 548 U.S. 53, 67–68,  (2006) (discussing materiality).

To establish causation, Plaintiff  must prove "the desire to retaliate was the
but for cause of" her termination—that is, "that the unlawful retaliation would not
have occurred in the absence of the alleged wrongful action or actions of the
[Defendant]." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. ——, ——, 133
S.Ct. 2517, 2528, 2533 (2013); see also *Van Horn v. Best Buy Stores, L.P* ., 526

F.3d 1144, 1148 (8th Cir.2008) ("To make out a retaliation claim, the plaintiff

must show that the protected conduct was a 'determinative—not merely a

motivating—factor' in the employer's adverse employment decision." (quoting

*Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1053 (8th Cir.2007))).

*Wright v. St. Vincent Health System,*  2013 WL 5225214, 4 (8th Cir. September

18, 2013).

With respect to her FMLA claim, Plaintiff does not argue Defendant

prevented her from taking FMLA leave. Thus, she has no "entitlement" claim. See

*Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8t Cir. 2012).

Her suit, instead, styles her FMLA claim as one for "retaliation." Plaintiff argues

Defendant took an adverse employment action against her because she exercised

her right to take FMLA leave.  Whether characterized as a "discrimination" claim

under § 2615(a)(1), see *id*. at 1006 (describing a discrimination claim as one

"aris[ing] when an employer takes adverse action against an employee because the

employee exercises rights to which he is entitled under the FMLA"), or as a

"retaliation" claim under § 2615(a)(2), see *Lovland v. Emp'rs Mut. Cas. Co.*, 674

F.3d 806, 811 (8th Cir. 2012) (explaining that "retaliation" claims arise under the

" 'discrimination' prohibition of § 2615(a)(2)"), Courts require proof of the

employer's discriminatory intent. See *Pulczinski*, 691 F.3d at 1007; accord

*Lovland*, 674 F.3d at 811–13. "This proof may come from direct evidence or indirect evidence using the *McDonnell Douglas* burden-shifting framework. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Brown*, 711 F.3d at 891.

In the absence of direct evidence, the Court applies the Title VII "*McDonnell Douglas* burden-shifting framework," *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir.2008), to FMLA claims. See *Pulczinski*, 691 F.3d at 1007 (citing *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011)).

Plaintiff has failed to state a *prima facie* case for both her claims because there is no evidence "a causal connection existed between the employee's action and the adverse employment action," *id*. (citing *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 754 (8th Cir.2011)). On the contrary, all the evidence indicates Plaintiff's actions did not "play[ ] a part" in Defendant's termination decision. *Hite,* 446 F.3d at 865 (quoting Kipp, 280 F.3d at 897).

It is clear on the record before the Court that Plaintiff was issued a written warning before she engaged in any protected activity.  Plaintiff acknowledges that she exercised her FMLA rights and complained of race discrimination on September 14, however, Plaintiff also testified that she believes the decision to terminate her employment was made before the September 9 written warning.

- 35 -

There is therefore, no causal connection between the protected activity and the

adverse employment action. *Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 933

(8th Cir. 2011).

Moreover, it is well establish that Plaintiff cannot protect herself from

further disciplinary action or discharge by engaging in protected activity.

> [Plaintiff] lodged complaints of discrimination days *after* receiving
> notices of the pre-disciplinary hearings that led to the three
> disciplines.  His post-hoc complaints did not without more raise a
> retaliation bar to the proposed discipline because "the anti-
> discrimination statutes do not insulate an employee from discipline
> for violating the employer's rules or disrupting the workplace."

*Id*., at 738 (emphasis in original)(citations omitted).

Notwithstanding Plaintiff cannot insulate herself from discipline, the length

of time between when Plaintiff claims to have engaged in protected activities and

the termination of her employment negates Plaintiff's ability to satisfy her burden.

Plaintiff claims she engaged in the protected activity on September 14, 2009. The

length of time— 2 months—between Plaintiff's engaging in protected activity and

her employment termination "dilute[s] any inference of causation such that the

temporal connection c[an] not justify a causal link as a matter of law." *McBurney*

*v. Stew Hansen's Dodge City, Inc.* 398 F.3d 998,  1003 (8th Cir.2005) (citing

*Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir.2002)) (concluding six

months is too long); see also *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900–01 (8th Cir.2012) (deciding "[m]ore than two months is too long ... without something more"); *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1088 (8th Cir.2010) (determining "approximately one month," without more evidence of causation, is too long) abrogated on other grounds by *Torgerson v. City of Rochester,* 643 F.3d 1031, 1043, 1058 app. (8th Cir. 2011).

Furthermore,  the undisputed evidence shows Defendant's supervisors communicated with Plaintiff about her unsatisfactory job  performance before she took FMLA leave. Additionally, Plaintiff's attitude was considered her supervisors to be subordinate before Plaintiff took FMLA leave. This record does not support a prima facie case of retaliation.  See, e.g., *Sisk v. Picture People, Inc.*, 669 F.3d 896,  900–01 (8th Cir. 2012).  Even if it did, summary judgment would remain appropriate because Plaintiff cannot show Defendant's stated reasons for terminating her employment were pretexts in retaliation for exercising her FMLA rights or for reporting racial discrimination. See, e.g., *Pulczinski*, 691 F.3d at 1007.

Even if Plaintiff showed a prima facie case for her FMLA and § 1981 claims, Defendant has  proffered a legitimate, nondiscriminatory reason for Plaintiff's discharge: after numerous attempts to assist Plaintiff in satisfactorily

- 37 -

performing her job duties, it determined that Plaintiff was not performing to the level required to keep up with the workload.  The Court concludes that the undisputed evidence reveals no triable issue of fact as to whether the proffered reason was pretextual. See, e.g., *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776–77 (8th Cir.2012) (under *McDonnell Douglas* framework, once employer proffers legitimate reason for its action, plaintiff must show that reason was pretext for unlawful discrimination).

### Conclusion

In conclusion, the Court finds that, in viewing the facts in the light most favorable to Plaintiff, Plaintiff has failed to establish that Defendant retaliated against her for exercising her FMLA rights or for reporting racial discrimination under 42 U.S.C. § 1981.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, [Doc. No. ], is **granted**.

A separate judgment will be entered upon the conclusion of all pending

issues herein.

Dated this 25th day of September, 2013.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE